OZEE, et al., Plaintiffs,

v.

The AMERICAN COUNCIL ON GIFT
ANNUITIES, et al., Defendants.

Civ. A. No. 7:94–CV–128–X.

United States District Court,
N.D. Texas,
Wichita Falls Division.

May 3, 1995.

1320

Lonny D. Morrison, Morrison & Shelton, Wichita Falls, TX, Ronald D. Wells, Milner Lobel Goranson Sorrells Udashen & Wells, Dallas, TX, Robert Elkin, Phillip N. Smith, Jr., Charles Watson Cunningham, Scott Robert Jacobs, McKool Smith, Dallas, TX, Frank N. Ikard, Jr., Ikard & Golden, Austin, TX, for Dorothy L. Ozee, and Boyd L. Richie, plaintiffs.

George C. Chapman, Gregory S. Huffman, William Mayer Katz, Jr., Thompson & Knight, Dallas, TX, for American Council On Gift Annuities, Inc., defendant.

Walter Franklin Williams, David Wayne Prasifka, Lorance & Thompson, Houston, TX, Richard T. McCarroll, William D. Pargaman, Brown McCarroll & Oaks Hartline, Austin, TX, Walter Hiram Mizell, Brown McCarroll & Oaks Hartline, Dallas, TX, for Lutheran Church—Missouri Synod, defendant.

Richard T. McCarroll, Brown McCarroll & Oaks Hartline, Austin, TX, Walter Hiram Mizell, Brown McCarroll & Oaks Hartline, Austin, TX, Roy T. Sparkman, Sparkman & Davison, Wichita Falls, TX, for Lutheran Church—Missouri Synod Texas District, defendant.

Richard T. McCarroll, William D. Pargaman, and Walter Hiram Mizell, Brown, McCarroll & Oaks Hartline, Austin, TX, Roy T. Sparkman, Sparkman & Davison, Wichita Falls, TX, for Lutheran Foundation of Texas, Gerald Bryan Kieschnick, Carl A. Heckman, and Glenn O'Shonney, defendants.

Walter Franklin Williams, David Wayne Prasifka, Lorance & Thompson, Houston, TX, for Concordia Lutheran College and Fred A. Bleeke, defendants.

George Randle Earle, Biggers Beasley Earle & Hightower, P.C., Dallas, TX, for Salvation Army, amicus.

Jan Soifer, Deputy Chief, Consumer Protection Div., Chief, Charitable Trusts Section, Austin, TX, for Dan Morales, movant.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

KENDALL, District Judge.

Before the Court is Plaintiffs' Motion for Partial Summary Judgment on Individual Claims which was filed on March 24, 1995. After having carefully considered the motion, response, reply, *amicus curiae* brief, the summary judgment evidence, and the applicable authorities, the Court is of the opinion that said motion is well-taken and should be GRANTED.

#### Summary Judgment Principles

■ Summary judgment is appropriate when there is no material factual dispute and the issues moved upon are merely questions of law to be answered by the Court in any event. Fed.R.Civ.P. 56; *J. Miller & Co. v. A. Schreter & Sons Co.*, 246 F.Supp. 737, 741 (D.Md.1965); *see Pettengill v. U.S.*, 867 F.Supp. 380 (E.D.Va.1994) (granting partial summary judgment on legal issue concerning negligence *per se*); *Venuti v. Riordan*, 521 F.Supp. 1027, 1030 (D.Mass.1981) (granting partial summary judgment on claim in which

issues of law predominated). If the movant bears the burden of proof on a claim, he must establish all elements of the claim to prevail on summary judgment. *Western Fire Insurance Co. v. Copeland,* 651 F.Supp. 1051, 1053 (S.D.Miss.1987), *aff'd,* 824 F.2d 970 (5th Cir. 1987). The evidence in the record is to be viewed in the light most favorable to the nonmoving party. *Newell v. Oxford Management Inc.,* 912 F.2d 793, 795 (5th Cir.), *reh'g denied,* 918 F.2d 484 (1990); *Medlin v. Palmer,* 874 F.2d 1085, 1089 (5th Cir.1989). Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202. In order to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *See Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

A partial summary judgment shall be granted "forthwith" when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact as to particular claims "or any part thereof." Fed.R.Civ.P. 56(a); *Barker v. Norman,* 651 F.2d 1107, 1123 (5th Cir.1981). Summary judgment at an early stage serves to crystalize the issues for ultimate trial. *See Samuel J. Miller & Co. v. A. Schreter & Sons Co.,* 246 F.Supp. 737, 741 (D.Md.1965), *aff'd,* 374 F.2d 510 (4th Cir.1967); *Harms, Inc. v. Tops Music Enterprises, Inc.,* 160 F.Supp. 77, 87 (S.D.Cal.1958). Indeed, a major benefit of partial summary judgment is to accelerate or to expedite litigation "by framing and narrowing the triable issues....". *Antenor v. D & S Farms,* 866 F.Supp. 1389, 1396 (S.D.Fla.1994); *Eldon Industries, Inc. v. Rubbermaid, Inc.,* 735 F.Supp. 786, 829

1. Exhibit 3 to Plaintiffs' Motion.

(N.D.Ill.1990); *c.f., FDIC v. Elefant,* 790 F.2d 661, 665 (7th Cir.1986).

### Undisputed Facts

On May 25, 1988, Rev. Kieschnick, the Executive Director of Defendant Lutheran Foundation of Texas ("the Foundation"), a Texas nonprofit corporation[1], wrote Ms. Louise Peter, a plaintiff in this case, which stated in part:

2. After this list of [your personal] assets has been accumulated, I would recommend ... transferring these assets to the Lutheran Foundation of Texas, to be held in trust for you. The trust agreements, which we would prepare, would need to state the amount of income which would be disbursed by the Foundation to you on a monthly basis. The trust agreements would also give you and the Foundation the authority to take money out of the trust, if the principal amount of the trust is needed for your health and welfare. The purpose of transferring your property and assets into such trust agreements would be:

a. To avoid a lengthy and costly probate process at the time when our Heavenly Father calls you to your heavenly home.

b. To place responsibility for management of your financial matters in the hands of the Foundation.

c. To provide the greatest possible degree of security for your property and possessions. (Exhibit A to Plaintiffs' Motion at page 2)

On July 25, 1988, Ms. Peter created the Living Trust, a revocable management trust managed by the Foundation, as Trustee. (Exhibit 2 to Plaintiffs' Motion—Defendants' state court petition at page 4) The sole beneficiary during Ms. Peter's lifetime is Ms. Peter herself. *Id.* All income from the Living Trust was distributed to Ms. Peter and the current balance of the trust's corpus is approximately $675,000. *Id.* Also in 1988, Ms. Peter donated $200,000 to the Foundation and received in connection with those donations two charitable gift annuities ("CGAs"). *Id.* Under the two annuity contracts, Ms. Peter is to receive an actuarially

calculated $1,116.67 per month per annuity for the remainder of her life. *Id.*

On February 28, 1990, Ms. Peter created the Unitrust, an irrevocable trust which pays Ms. Peter each year eight percent of the current net fair market value of the Unitrust, but no more than the net income, if less. *Id.* Upon Ms. Peter's death, the assets are distributed among several charities. *Id.* Both the Unitrust and the two gift annuities gave rise to significant income tax deductions for Ms. Peter. *Id.*

### 1. Engaging in the Unauthorized Business of Insurance

■ Texas Insurance Code Article 1.14(1) (Vernon 1981), requires the State Board of Insurance to issue certificates of authority which authorize the transaction of the "business of insurance" only by those whom the Board is satisfied have "in all respects fully complied with the law" and unambiguously prohibits all individuals and corporations from engaging in the unauthorized business of insurance.[2] Therefore, to transact any insurance business or sell insurance products in Texas, one must possess a certificate of authority from the State Board of Insurance. TEX.INS.CODE articles 3.57; 21.01 (Vernon 1981).

In the case at bar, it is undisputed that the Foundation is not chartered as an insurance company (Exhibit 3 to Plaintiffs' Motion), and that it has never obtained a certificate of authority from the Texas Board of Insurance to issue or to sell annuities.[3] It is also clear that the Foundation engaged in the unauthorized business of insurance when it issued and sold the two annuity contracts to Ms.

Peter and charged her annuity management fees without certification from the Texas Insurance Board, or authorization from any other statute[4]. (Exhibit 2 to Plaintiff's Motion at pages 2 and 4). Section 5 of these annuity contracts provided that the Foundation deducts "its reasonable and customary fees and expenses" from the annuity fund principal. *Id.*

■ Bearing this in mind, the Court turns to whether the Foundation's issuing or selling CGAs to Ms. Peter constitutes "the business of insurance" in violation of the above-referenced Insurance Code provisions. Texas Insurance Code article 1.14–1(2)(a) (Vernon Supp.1995) defines "the business of insurance" as any of the 11 categories it lists, including:

1. The making of or proposing to make, as an insurer, an insurance contract.

\*   \*   \*   \*   \*   \*

4. The receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance or part thereof.

5. The issuance or delivery of contracts of insurance to residents of this state or to persons authorized to do business in this state.

\*   \*   \*   \*   \*   \*

8. The doing of any kind of business specifically recognized as constituting the doing of an insurance business within the meaning of the statutes relating to insurance.

9. The doing or proposing to do any insurance business in substance equivalent

---

2. Texas Insurance Code Article 1.14(1) (Vernon 1981), in pertinent part, provides:
   No individual, group of individuals, association or corporation, unless now or hereafter otherwise permitted by statute shall be permitted to engage in the business of insuring others against those losses which may be insured against under the laws of this state. Should the State Board of Insurance be satisfied with any insurance carrier applying for a certificate of authority, it shall be its duty to issue such carrier a certificate of authority, under its seal, authorizing such carrier to transact insurance business. . . .

3. Indeed, as a non-profit corporation, the Foundation is expressly prohibited by the Texas Non-

Profit Corporation Act, TEX.REV.CIV.STAT. Art. 1396–2.01(B) (West 1994), from engaging in the business of insurance under Texas law.

4. Although Insurance Code article 1.14(1) states that ". . . . unless now or hereafter otherwise permitted by statute . . . ," and article 1.14–1(3)(b) (Vernon Supp.1995) provides that, "No person or insurer shall directly or indirectly do any of the acts of an insurance business set forth in this Article except as provided by and in accordance with the specific authorization of statute", there is no other statute which authorizes one to engage in the insurance business.

to any of the foregoing in a manner designed to evade the provisions of the statutes.

The Court finds that when the Foundation issued and sold these two annuities, it engaged in the insurance business in at least the following ways: it made insurance contracts, TEX.INS.CODE Art. 1.14–1(2)(a)(1) (Vernon Supp.1995); it issued or delivered contracts of insurance to a resident of Texas, *Id.* at Art. 1.14–1(2)(a)(5); it did business specifically recognized as the business of insurance under the Insurance Code, *Id.* at Art. 1.14–1(2)(a)(8); and it solicited and received applications for insurance, *Id.* at Art. 21.01. Similarly, the Foundation's charging of fees and expenses for administering the annuities constitutes "receiving or collecting ... consideration for any insurance or part thereof" under TEX.INS.CODE Art. 1.14–1(2)(a)(4).

The Foundation's issuance of these annuities also constitutes "the business of insurance" because the Foundation, in concert with other Defendants, acted in a manner designed to evade the provisions of the statutes in violation of TEX.INS.CODE Art. 1.14–1(2)(a)(9). A leading representative of Defendant American Council on Gift Annuities ("the Council") wrote an article which surveyed the various state insurance laws and informed Council members (including the Foundation) that the State Board of Insurance considered the sale of annuities to be the business of insurance and required issuers of such annuities to qualify or to register as commercial insurance companies. (Exhibit B to Plaintiff's Brief at page A–24) The article informed charities how to sell annuities and to avoid detection by state regulators:

> Network with other charities to resolve questions. Do NOT ask state regulators directly. Inquire through third parties, NOT identifying your organization. You must comply with direct answers from regulators. Above represents only the *current* interpretations of the state regulators,

given to 3rd parties and are binding on an organization if it asks directly.

*Id.* at A–28. Such surreptitious avoidance of detection is precisely the type of activity described by article 1.14–1(2)(a)(9) as performing acts "in substance equivalent to any of the foregoing in a manner designed to evade the provisions of the statutes."

The Foundation cites *Daniel v. Life Ins. Co. of Virginia,* 102 S.W.2d 256 (Tex.Civ. App.—Austin 1937, no writ), for the proposition that annuities are not covered by the Texas Insurance Code. However, *Daniel* is irrelevant since it predates the Texas Insurance Code, and unpersuasive since it in no way suggests that sellers of annuities need not obtain specific authorization. *Daniel,* which held that a particular tax statute was not intended to tax certain revenue from the sale of annuities, is directly contrary to the express language of the subsequently enacted Texas Insurance Code and recent case law.

Annuities, charitable or not, are regulated by the Texas Insurance Code. *NationsBank of North Carolina, N.A., v. Variable Annuity Life Ins. Co.,* —— U.S. ——, ——, 115 S.Ct. 810, 816, 130 L.Ed.2d 740 (1995) (states generally regulate the sale of annuities under their insurance regulations even when a particular federal statute might not regulate annuities as insurance.) Each annuity contract issued or sold to Ms. Peter was "a policy or contract of insurance" under TEX.INS.CODE article 21.22(6) (Vernon Supp.1995) ("For purposes of regulation under this code, an annuity contract issued by a life, health, or accident insurance company, including a mutual company or fraternal company, or under any plan or program of annuities or benefits in use by an employer or individual, shall be considered a policy or contract of insurance.") [5]

In fact, the Insurance Code uses the term "annuity," or a variation of it, in approximately forty different provisions in the Insurance Code, and the term's usage in those various provisions further confirms this.

---

5. Regarding the 1993 amendments to art. 21.22, the Fifth Circuit has recently held that the "nature of changes to art. 21.22 indicates that the Texas legislature intended to clarify its original intent with respect to the exemption of annuities, rather than to alter the substantive effect of art. 21.22." *In re Walden,* 12 F.3d 445, 449 n. 7 (5th Cir.1994).

TEX.INS.CODE Art. 1.11, 1.14–1, 3.01, 3.02, 3.28, 3.33, 3.42, 3.42A, and 3.44b (Vernon 1981 and Vernon Supp.1995). One of these sections even expressly refers to annuities as part of "the business of insurance" when it states that "[a] life insurance company shall be deemed to be a corporation doing business under any charter involving the payment of money or other thing of value, conditioned on the continuance or cessation of human life, or involving an insurance, guaranty, contract or pledge for the payment of endowments or annuities." TEX.INS.CODE Art. 3.01(1) (Vernon 1981 and Vernon Supp.1995). Clearly, annuities are covered by the Insurance Code. *See United States v. Bond,* 258 F.2d 577, 580 (5th Cir.1958); *Van Der Meulen v. Southwestern Life Ins. Co.,* 514 S.W.2d 469, 472 (Tex.Civ.App.—San Antonio 1974, writ ref'd); *Skillern v. State,* 890 S.W.2d 849 (Tex.App.—Austin 1994, n.w.h.). Neither the Insurance Code nor any other authority which the Court has been able to locate, distinguishes CGAs from any other type of annuity.[6]

The Court also rejects the Foundation's characterization of CGAs as "charitable donations" and not "commercial activity." They are not purely a charitable donation. The Foundation advances two erroneous legal propositions: that the Texas Insurance Code and Texas Banking Code, laws of general application, only apply to "pure" commerce transactions, and not "pure" charitable ones, and that the two CGA transactions must be either "pure" charity or "pure" commerce. No legal authority supports either proposition. Even if such authority existed,

it would completely defy common sense by disregarding the reality that these transactions were at least partially commercial, i.e., they were part investment as well as part gift. The CGAs the Foundation issued were meant to provide Ms. Peter with an income stream for life—a commercial purpose. *See State v. Memorial Benevolent Soc'y of Texas,* 384 S.W.2d 776, 778 (Tex.Civ.App.—Austin 1964, writ ref'd n.r.e.) (rejecting attempt to characterize "premiums" as "donations" and enjoining non-profit corporation from conducting unauthorized insurance business). The exchange of money for services, as is present in this case [7], is a quintessential commercial transaction.

The Texas Insurance Code applies even where a CGA is obtained by a person motivated exclusively by charitable, not commercial, intent. Intent is irrelevant to whether someone is deemed to be engaged in a business, *see Petteway v. State,* 36 Tex. Crim. 97, 35 S.W. 646, 646–47 (1896). A person's motive does not determine whether a transaction is charitable. The nature of the transaction is determined by the purpose to which the gift is appropriated. *Davis v. Gulf, C. & S.F. Ry. Co.,* 196 S.W. 603 (Tex. Civ.App.—Fort Worth 1917, writ ref'd); *cf. Willacy County Appraisal Dist. v. North Alamo Water Supply Co.,* 676 S.W.2d 632, 636 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.).

The Foundation also maintains that it did not engage in the business of insurance since federal tax law recognizes that CGAs have a donative aspect [8]. This unsupported leap in

---

**6.** Indeed, the Texas Department of Insurance has even ruled that issuing or selling CGAs is "the business of insurance." (Exhibit A, Plaintiffs' Brief) The Fifth Circuit also recognizes the similarities between annuities and life insurance in holding that annuities are insurance under the Texas Securities Act: "In life insurance, the risk from which protection is usually sought is that the insured may die young without provisions for his dependents; in an annuity, the risk is that the annuitant may live long, outliving his means for his own support." *Haberman v. Equitable Life Assur. Soc'y.,* 224 F.2d 401, 406 (5th Cir.1955), *cert. denied,* 350 U.S. 948, 76 S.Ct. 322, 100 L.Ed. 826 (1956).

**7.** Exhibit C to Plaintiff's Response—Rev. Kieschnick affidavit, paragraphs 10 and 11, where he

described Ms. Peter's interest in the annuities as follows: "Since she had a substantial amount of cash on hand, most of which was uninsured, all of which could be earning a greater yield, she was attracted to the idea of a charitable gift annuity." He also testified that the CGAs were a "method" that would "provide for [Ms. Peter's] lifetime financial needs."

**8.** Internal Revenue Code § 170(f)(2) allows a federal income tax charitable deduction for gifts of charitable remainders only if the gift takes the form of a charitable remainder annuity trust, a charitable remainder unitrust, or if the gift is made to a pooled income fund maintained by the charity. Also, Internal Revenue Code § 501(m) excludes charitable gift annuities from the definition of "commercial type insurance."

logic—that the CGA cannot be deemed an insurance product or contract under Texas law since federal law deems it to be a charitable gift vehicle—is simply incorrect. Even though the Foundation is correct that CGAs are recognized charitable gift vehicles, they are nevertheless insurance products or contracts under Texas law.

▆▆▆▆ The Foundation's argument that CGAs do not constitute a "sale" of the annuity because they are "issued," is merely a distinction without a difference since either amounts to "engaging" in the business of insurance under Insurance Code art. 1.14(1). However, even assuming that "issuing" an annuity was not "engaging" in the business of insurance, the Court finds that the Foundation "sold" CGAs. The summary judgment evidence indicates that Ms. Peter received the two CGAs in connection with her $200,000 donation. Surely this demonstrates a sale absent evidence that the Foundation was not "issuing" annuities without first obtaining a donation.

In sum, offering, making, issuing, selling, or delivering an annuity contract constitutes "the business of insurance" under the Insurance Code, *see* TEX.INS.CODE Art. 1.14–1(2)(a) (Vernon Supp.1995) (particularly Art. 1.14–1(2)(a)1, 5, & 8); TEX.INS.CODE Art. 21.22(6) (Vernon Supp.1995), and any corporation doing business under any charter involving annuities has engaged in "the business of insurance."

### 2. Engaging in an Unauthorized Trust Business

▆▆▆▆ The Texas Trust Code requires that corporate trustees have two attributes: (1) "the legal capacity to take, hold, and transfer the trust property;" and (2) "the power to act as a trustee in this state." TEX.PROP. CODE § 112.008 (Vernon 1984). In Texas, only those corporations specifically authorized by statute have the power to act as a trustee of Texas trusts. *See Port Arthur Trust Co. v. Muldrow*, 155 Tex. 612, 291 S.W.2d 312 (1956); *Stewart v. Ramsey*, 223 S.W.2d 782 (Tex.1949). The only source of a corporation's power to act as a trustee in

Texas is the Texas Banking Code, Art. 342–902, which provides that:

> It shall be unlawful for any person, corporation, firm, partnership, association or common law trust:
>
> (1) [t]o conduct a banking or trust business or to hold out to the public that it is conducting a banking or trust business; or
>
> (2) [t]o use in its name, stationery or advertising, the term "bank," "bank and trust," "savings bank," "certificate of deposit," "trust" or any other term or word calculated to deceive the public into the belief that such person, corporation, firm, partnership, association, common law trust, or other group of persons is engaged in the banking or trust business. . . . TEX. BANKING CODE, Art. 342–902 (Vernon Supp.1994).

This same article, however, provides an exception: "to the extent that such corporations are authorized under their charter or the laws of this state or of the United States." Thus, unless a corporation is chartered as a trust company or authorized by statute to conduct a trust business, it may not exercise trustee powers or engage in the trust business.[9]

▆▆▆▆ The Court finds that the Foundation, by assuming and exercising the office of trustee of at least two Texas trusts for compensation, engaged in an unauthorized "trust business" in violation of TEX. BANKING CODE Art. 342–902, and TEX.PROP.CODE § 112.008. That the Foundation is trustee of at least two trusts (the Living Trust and the irrevocable Unitrust) established by Ms. Peter is undisputed. (Exhibit 2 to Plaintiffs' Motion at page 1) Also undisputed is the fact that the Foundation was not incorporated as a trust company in accordance with the Texas Banking Code. *Id.* Additionally, the Foundation cannot dispute that it regularly charges fees and expenses as consideration for its trustee services and has done so for many years. (Exhibit C to Plaintiffs' Motion at paragraph 3 states that its trust manage-

---

**9.** Texas Banking Code article 342–1101(1)(a) states that, "[p]rior to exercising trust powers, a trust company shall incorporate in accordance with [the Banking Code.]"

ment fees "are in line with most banks and trust companies.")

██ The Foundation's initial contention—that the Banking Code does not apply to it because it is not a "trust business"—is unpersuasive on its face in light of the fact that it is currently acting as her trustee, and in light of the Foundation's letter soliciting Ms. Peter to transfer her assets to the Foundation "to be held in trust." The Court finds that the Foundation violated the above-referenced provisions by promoting its services to the public [10], administering investment/trust funds for the benefit of an unrelated third party (Ms. Peter) [11], and charging management fees for its services [12].

██ The Texas Banking Code prohibition applies to Texas non-profit corporations as well as other types of corporations even if it is a charitable trust which is set up by a person motivated by charitable intent. It expressly states "any person, corporation ..." *Id.* (emphasis added) Absent any other statute explicitly authorizing non-profits to serve as trustees, the Court will not strain to reach a result antithetical to the express language of existing Texas law. While the Texas Non–Profit Corporation Act, TEX. REV.CIV.STAT.ANN., art. 1396–2.02(A)(16) (Vernon 1980 and Supp.1995), in certain limited situations allows nonprofit corporations to "acquire, own, hold, mortgage, and dispose of and invest" funds in trust, a more thorough reading of this article reveals that it addresses the nonprofit corporation's own funds, not the funds of a third party or trust, and allows that the charities' own funds may be held "in trust for any convention, confer-

ence or association ... with which it is affiliated, or which elects its board of directors, or which controls it." So, in that respect, the Foundation is correct. However, in the case at bar, which involves the Foundation acting as a trustee for a third party, Ms. Peter, the Foundation is incorrect. Nowhere in article 1396–2.02(A)(16) is it expressed, or even implied, that a nonprofit corporation can administer any sort of express trust for the benefit of an unrelated third party.[13] Rather, article 1396–2.02(A)(16), by its own terms, only permits a nonprofit corporation to hold in trust "its funds," and then only for the benefit of agencies "with which it is affiliated, or which elects its board of directors, or which controls it, in furtherance of the purposes of the member institution." *Id.* The power to own and to hold an interest in real property is not the functional equivalent of the power to hold or to own an interest in property as a trustee for the benefit of a third party. The Court finds no authority that contorts this unambiguous limited statutory power into an authorization to assume financial management responsibilities over a separate, independent trust for an independent third party.

██ Likewise, articles 1396–2.02(A)(4)[14] and (15)[15] of the Texas Non–Profit Corporation Act do not authorize the Foundation to conduct "trust business." Indeed, the Court cannot imagine how it is "necessary and appropriate to effect the purposes" of the Foundation for it to be charging trust management fees to generate investment income for members of the general public. Moreover, these provisions are simply general grants of powers to effect the corporation's

---

10. Foundation By-laws at page 12, articles 6.11(m) and (*o*) (unnumbered exhibit to Foundation's Response following Pittsford Affidavit)

11. Exhibit C to Plaintiff's Motion.

12. *Id.*

13. As correctly reasoned in the Herrick letter (Exhibit C to Plaintiff's Brief): "If the legislature had intended to enable a nonprofit corporation to act as a trustee beyond the limitations set forth in Article 1396–2.02(A)(16) of the Non–Profit Act, then the legislature would not have limited their activities in this area, but would have granted nonprofit corporations unlimited or, at least, more broad trust powers, much like those previously granted to corporations under Articles

1303b and 1513a, Vernon's Texas Civil Statutes Annotated (repealed)."

14. Article 1396–2.02(A)(4) grants nonprofit corporations the general power to "acquire, own, hold, improve, use, or otherwise deal in and with, real or personal property, or any interest therein, wherever situated, as the purposes of the corporation shall require ..."

15. Article 1396–2.02(A)(15) provides nonprofit corporations the power "to have and exercise all powers necessary or appropriate to effect any and all of the purposes for which the corporation is organized."

lawful purposes. They neither grant trust powers nor override the specific prohibitions against conducting "trust business" in the Banking Code. They do not authorize nonprofit corporations to administer trusts to avoid probate costs, allow nonprofit corporations to manage the financial affairs of independent third parties, or permit nonprofit corporations to provide security for the property of independent third parties. Clearly, the right to receive gifts and bequests from trusts, as addressed by these provisions, is quite different from the right to administer a trust under Texas law. The Texas Department of Banking agrees that corporations incorporated under the Texas Non-profit Corporation Act may not serve as trustees. (Exhibit C to Plaintiffs' Brief at pages 3 and 4).

■ Texas common law also does not authorize nonprofit corporations to act as trustees to further their charitable purposes, or for any other reason. Indeed, Texas common law supports the exact opposite conclusion. *Port Arthur Trust Co. v. Muldrow,* 155 Tex. 612, 291 S.W.2d 312 (1956) holds that a corporation may hold property as a trustee if chartered under a statute that permits it to do so and only to the extent permitted by statute and its charter.[16] Moreover, the treatises referenced by the Foundation to support this argument are unavailing when viewed in their full context, and the cases from other jurisdiction are irrelevant since they involve completely different regulatory schemes.

■ Also, the Foundation's claim that it was not conducting a "trust business" because it made no "profit" from its sale or issuance of CGAs, is irrelevant. The issue is not whether or not it profited, but whether purveyors of annuities of all forms must comply with the general regulations of the Texas Insurance Code and Texas Banking Code—such as minimum capital, accounting, and reporting requirements: regulations which were enacted to protect trust beneficiaries whose funds are at risk because of these services. The "profit" argument is nothing

but a red herring since the level at which an entity sets its fees does not determine if it is in business. Were that true, any unsuccessful business person could escape regulation by relying on this "profit exemption" which the Foundation contends exists. Even if there were a "profit exemption," "profit" would not be construed by this Court to only be mere shareholder dividends, but would also include any undistributed retained earnings from the "trust business."

Similarly, the Foundation's contention that the Banking Code does not apply to **all** corporations since Article 9.03(b)(3) of the Texas Insurance Code—which provides title insurance companies the legal capacity to act as trustee—also misses the mark because art. 9.03(b)(3) is a specific authorization by law which satisfies the requirement of Banking Code article 342–902 that any corporation engaging in the trust business must have express authorization.

The Texas Non–Profit Corporations Act does not in any way authorize a nonprofit corporation to place itself in the type of conflict position which the Insurance Code and Banking Code were enacted to regulate. The conflicting interests presented in this case are obvious. Ms. Peter, on the one hand, as beneficiary of the income received from the trust corpus for the length of her life, seeks to maximize the income and to sacrifice capital growth of the trust corpus. The nonprofit Foundation, on the other hand, as trustee and remainder beneficiary, seeks to sacrifice income during Ms. Peter's life and to maximize the growth of the trust corpus since it will receive the trust corpus upon Ms. Peter's death.

■ In addition, the Foundation's contention that its by-laws allow it to hold property in trust, is also legally incorrect. (Foundation's Response Brief at page 9; affidavit of Glenn Pittsford, paragraph 3, and Foundation's By-laws attached to Pittsford affidavit at §§ 4.12, 5.02) The fact that the corporate by-laws permit it to act in a fiduciary capacity does not authorize it to so act since the by-

**16.** *Muldrow* states, "Of course, the corporation would have to be chartered under a statute permitting it to act as trustee, and its charter must

give it such power." *Muldrow,* 291 S.W.2d at 314.

laws cannot exceed the scope of authority granted under its charter and the Texas Non–Profit Corporation Act under which it was incorporated. In addition, the Foundation's charter does not permit it to administer trusts.

 The Court is also unpersuaded by the Foundation's contention that its First Amendment rights would be derogated if state law were construed to impinge on gifts made to religious organizations in the form of charitable gift annuities. The First Amendment is simply not an impediment to such generally applicable business regulations as the Texas Banking Code and the Texas Insurance Code. *See e.g. Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 704, 106 S.Ct. 3172, 3175, 92 L.Ed.2d 568 (1986). These statutes certainly do not raise free speech concerns by their regulation of only charitable solicitations. The cases cited by the Foundation address the free speech aspects of laws aimed directly at the solicitation of donations by charitable organizations. *See e.g. Riley v. National Fed'n of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (statute that specifically regulated the actual solicitation of charitable contributions).

In sum, neither the Texas Non–Profit Corporation Act nor any other state law authorizes the Foundation or any other non-profit corporation to hold the office of trustee and to exercise trustee powers for an independent third party without incorporating as a trust company in compliance with the Texas Banking Code.

\* \* \* \* \* \*

The Court, therefore, **DECLARES** as a matter of law that (1) the Foundation's sale of annuities and charging of annuity management fees to Ms. Peter constitutes the unauthorized business of insurance under the Texas Insurance Code; and (2) that the Foundation illegally accepted and exercised the office of trustee of Plaintiffs' Texas trusts in violation of Texas law.

The Court further **ORDERS** that Plaintiffs' Motion for Partial Summary Judgment on Individual Claims pursuant to Fed. R.Civ.P. 56(a) and 56(c) is **GRANTED** since

no genuine issue of material fact exists as to each of the sought declarations.

IT IS SO ORDERED.